**In re Robert D. JERABEK.**

**Appeal Nos. 85–2008, 85–2009.**

United States Court of Appeals, Federal Circuit.

April 24, 1986.

Edward M. O'Toole, Marshall, O'Toole, Gerstein, Murray & Bicknell, of Chicago, Ill., argued for appellant. With him on the brief was Carl E. Moore, Jr.

Henry W. Tarring, II, Associate Sol., U.S. Patent & Trademark Office, of Arlington, Va., argued for appellee. With him on the brief were Joseph F. Nakamura, Sol. and Fred E. McKelvey, Deputy Solicitor.

Herbert F. Schwartz, Fish & Neave, of New York City, argued for intervenor, Celanese Polymer Specialties Co. With him on the brief were David J. Lee, James F. Haley, Jr. and Ron E. Shulman.

Before FRIEDMAN, DAVIS and SMITH, Circuit Judges.

DAVIS, Circuit Judge.

This is a consolidated appeal from two decisions of the United States Patent and Trademark Office (PTO) Board of Appeals (Board), sustaining the examiners' rejection of all claims in related reissue applications, Serial Nos. 198,291 (the '291 reissue application) and 198,526 (the '526 reissue application). All claims in the two applications were rejected as unpatentable under 35 U.S.C. § 103 because of obviousness, and also as violative of the duty of disclosure, set forth in 37 C.F.R. § 1.56(a), under 35 U.S.C. §§ 131 and 132. Additionally, claim 11 of the '526 reissue application was rejected as anticipated under 35 U.S.C. § 102. We affirm solely on the ground that all the claims of the reissue applications were properly rejected under 35 U.S.C. §§ 131 and 132 because of a violation of the duty of disclosure through gross negligence in the prosecution of the applications resulting in the original patents.

## I. BACKGROUND

### A. *Subject Matter of the Inventions*

Electrodeposition as a coating application method involves the deposition of a film forming material under the influence of an applied electrical potential, and has become of increasing commercial importance. Unlike conventional coating techniques, i.e., spraying and dipping, electrodeposition produces a commercially-useable film having such advantages as a uniform thickness and improved hardness, toughness, flexibility and solvent resistance. Other advantages of electrodeposited films include an excellent green (uncured) strength, due to its high solid content, and a better appearance and cure.

The present inventions relate to electrodeposition coating compositions having a cationic charge and to a method of electrodepositing those compositions. Generally, the '291 reissue application, which seeks reissue of U.S. Patent No. 4,031,050 (the '050 patent),[1] discloses an electrodeposition composition comprising an epoxyamine adduct and a blocked or capped polyisocyanate curing agent. Claim 1, as originally filed, is representative:

1. A composition comprising:

A. a synthetic-hydroxyl-containing adduct which is the reaction product of a primary or secondary amine and a polyepoxide, said adduct being solubilized with acid to provide cationic groups in said adduct,

B. a blocked polyisocyanate stable at ordinary room temperature in the presence of said adduct and reactive with said adduct at elevated temperatures.

The '526 reissue application, which seeks reissue of U.S. Patent No. 3,984,299 (the '299 patent),[2] discloses a method of electrodepositing the composition disclosed in the '291 reissue application and to an article so electrocoated. Claims 1 and 11 are representative:

1. In a method of electrocoating an electrically-conductive surface serving as a cathode which comprises passing electric

1. U.S. Patent No. 4,031,050, issued on June 21, 1977 to appellant, Robert D. Jerabek, was based on application Serial No. 547,275, filed February 5, 1975, which was a Continuation-in-Part of Serial No. 400,088, filed September 24, 1973, which was a Division of Serial No. 193,590, filed October 28, 1971, which is a Continuation-in-Part of Serial No. 047,917, filed June 19, 1970, now U.S. Patent No. 3,700,854 (Cationic Electrodepositable Compositions of Blocked NCO and Acid Salt of Adduct of Amine and Polyepoxide).

2. U.S. Patent No. 3,984,299, issued on October 5, 1976, to appellant, Robert D. Jerabek, was based on application Serial No. 547,327, filed February 5, 1975, which was a Continuation-in-Part of Serial No. 193,590, filed October 28, 1971, which was a Continuation-in-Part of Serial No. 047,917, filed June 19, 1970, now U.S. Patent No. 3,799,854 (Cationic Electrodepositable Compositions of Blocked NCO and Acid Salt of Adduct of Amine and Polyepoxide).

current between said cathode and an anode in contact with an aqueous electrodepositable composition, the improvement wherein said electrodepositable composition comprises:

A. a hydroxyl-containing adduct which is the reaction product of a primary or secondary amine and a polyepoxide, said adduct being solubilized with acid to provide cationic groups in said adduct,

B. a blocked organic polyisocyanate stable at room temperature in the presence of hydroxyl or amino groups but reactive with hydroxyl or amino groups at elevated temperatures.

11. An article electrocoated by the method of claim 1.

## B. *Related Litigation*

Both the '050 and the '299 patents were assigned to PPG Industries (PPG) and were prosecuted before the PTO by Mr. William J. Uhl, an attorney employed at PPG. In September 1978, PPG brought suit against the Celanese Polymer Specialties Company (CPSC), the intervenor in the present appeal, in the United States District Court for the Western District of Kentucky alleging infringement of the two patents.[3] During the initial stages of discovery, CPSC uncovered certain records from the Japanese Patent Office; these records revealed that in 1975 and 1976, PPG relied on Sattler, U.S. Patent No. 3,321,548 (the Sattler patent)[4] to successfully oppose a third party Japanese patent application which claimed subject matter similar to that claimed in the '050 and '299 patents. As a consequence of the Japanese records, CPSC moved for and was granted an extension of the discovery period. During further dis-

covery, CPSC found other evidence which demonstrated that PPG knew of the Sattler patent during the time of the prosecution of the '050 and '299 patents.

On the eve of trial, PPG moved for a stay of all proceedings until it filed and completed prosecution of reissue applications '291 and '526 before the PTO. The district court granted PPG's motion and stayed further proceedings pending the outcome of the reissue proceedings.

## C. *Reissue Proceedings*

PPG filed reissue applications '291 and '526 in the PTO on October 20, 1980. The applications were sent to the Office of the Assistant Commissioner for Patents for review on the issues of "fraud" and violation of the duty of disclosure. The Assistant Commissioner deferred consideration of these issues and sent the applications to the Examining Group for a decision on the patentability of the reissue claims in light of the Sattler patent as well as other references. In an initial office action, the examiner rejected all of the claims of the '291 reissue application as unpatentable under 35 U.S.C. § 103 over the Sattler patent in combination with other references; claims 1, 4 and 5 were further rejected under 35 U.S.C. § 102 over Sattler alone. PPG's response to the examiner's action was to amend independent claim 1 to overcome the § 102 rejection.[5] Following entry of appellant's amendment, the examiner finally rejected all the claims of the '291 reissue application under 35 U.S.C. § 103 over the Sattler patent in combination with other references.

All of the claims of the '526 reissue application were initially rejected under 35

3. *See PPG Industries, Inc. v. Celanese Polymer Specialties Company,* Civil Action No. C 78–0380L(A), U.S. District Court for the Western District of Kentucky.

4. The Sattler patent, filed December 31, 1962, issued to Frank A. Sattler on May 23, 1967 and was assigned to the Westinghouse Electric Corporation in Pittsburgh, Pennsylvania.

5. Claim 1 was amended to read:

Claim 1 (Amended). *An aqueous electrodepositable* composition comprising:

A. a synthetic hydroxyl-containing adduct which is the reaction product of a primary or secondary amine and a polyepoxide, said adduct being solubilized with acid to provide cationic groups in said adduct,

B. a blocked polyisocyanate stable at ordinary room temperature in the presence of said adduct and reactive with said adduct at elevated temperatures.

U.S.C. § 103 over the Sattler patent in combination with other references. Alternatively, claim 11 of the application was rejected under 35 U.S.C. § 102 over Sattler alone. No amendments to the claims were made in appellant's response to the examiner's initial action. Maintaining his earlier rejections, the examiner finally rejected the reissue application.

Following the final rejection of both reissue applications, the applications were returned to the Assistant Commissioner for consideration of issues relating to fraud and misconduct. After nearly one year of examination, the Fraud Examiner found that Sattler was clearly material to the claims in the applications for both the '050 and '299 patents and that PPG's attorney was at least grossly negligent in failing to bring the Sattler patent to the attention of the examiner handling each application. Accordingly, the Fraud Examiner rejected both reissue applications under 35 U.S.C. §§ 131 and 132 based on violation of the duty of disclosure as set forth in 37 C.F.R. § 1.56(a) (1984).[6]

On appeal to the Board, the Board unanimously affirmed the prior art rejections in both reissue applications.[7] Similarly, a unanimous Board affirmed the rejections based on "fraud" under sections 131 and 132 in both applications. PPG petitioned the Board for reconsideration of both decisions contending (1) that the Board erred in characterizing PPG's conduct during prosecution of the applications for the '299 and '050 patents as "fraud" and (2) that the Board improperly assessed the alleged commercial success of the claimed subject matter. On reconsideration of the '291 reissue application, the Board concluded that sufficient weight was given to the "secondary considerations" in the initial decision. With respect to the issue of fraud, the Board affirmed its initial determination but modified the language to be more in line with the judicially created doctrine of "inequitable conduct." The Board noted that it was "aware that the judicially created precedent in fraud in the [PTO] is broader than 'common law fraud'." Similarly, on reconsideration of the '526 reissue application, the Board upheld its initial decision.

On the appeal to this court, issues concerning the patentability of the reissue claims over prior art of record have been raised, in addition to the question of whether "inequitable conduct" occurred through violation of the duty of disclosure. Because our decision turns wholly on the question of "inequitable conduct" and that holding is sufficient to sustain the decision below, we do not find it necessary to pass on the remaining issues.

## II. INEQUITABLE CONDUCT

### A. *Standard of Review*

 "Inequitable conduct" requires proof by clear and convincing evidence of a threshold of materiality of the nondisclosed information and of the prosecutor's intent. *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1559, 223 USPQ 1089, 1094 (Fed. Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 73, 88 L.Ed.2d 60 (1984). Materiality and intent are factual issues, *American Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1363, 220 USPQ 763, 773 (Fed.Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984), and we must affirm such factual findings (made by the court) unless they are clearly erroneous. *Raytheon Co.*

---

6. 37 C.F.R. § 1.56(a) provides:

§ 1.56 Duty of disclosure; fraud; striking or rejection of applications.

(a) A duty of candor and good faith toward the Patent and Trademark Office rests on the inventor, on each attorney or agent who prepares or prosecutes the application.... All such individuals have a duty to disclose to the Office information they are aware of which is material to the examination of the application. Such information is material where

there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.

7. The examiners also rejected all the claims in both reissue applications for non-joinder of a co-inventor under 35 U.S.C. §§ 102(f), 116 and 256. This rejection, which was reversed by the Board, is not at issue in this appeal.

*v. Roper Corp.*, 724 F.2d 951, 956 (Fed. Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 127, 83 L.Ed.2d 69 (1983).[8] Once the thresholds of materiality and intent are established, we must conduct a balancing test and determine, as a matter of law, whether the scales tilt to a conclusion that "inequitable conduct" occurred. *American Hoist,* 725 F.2d at 1364, 220 USPQ at 774.

## B. *Materiality of the Sattler Patent*

The Board found by clear and convincing evidence that the Sattler patent was material to the prosecution of the original patents. During the reissue examination, two examiners rejected the reissue claims over the Sattler patent, alone and in combination with other references. These rejections were later affirmed by the Board. The Board noted that claims 1, 4, and 5 (as originally filed in the '291 reissue application) and claim 11 (as originally filed in the '526 reissue application), which were rejected over the Sattler patent under section 102, were claims actually issued in the '050 and '299 patents, respectively.

The starting point for determining materiality of the Sattler patent is the PTO standard, i.e., a substantial likelihood that a reasonable . examiner would have considered the nondisclosed information important in deciding whether to allow the application to issue as a patent. *J.P.Stevens,* 747 F.2d at 1562, 223 USPQ at 1094. On this standard we cannot say that the Board was clearly erroneous in finding materiality. The results of the PTO reissue examination proceedings were plainly of strong probative value on the materiality of the Sattler reference. Further, there was pertinent evidence relied on by the Board that appellant's counsel continually noted during the prosecution of the original patents

that none of the prior art cited taught the combination of the epoxy-amine adduct and the completely blocked or capped isocyanate curing agents. Because the Sattler patent disclosed appellant's epoxy-amine adduct in combination with a fully blocked isocyanate, it is clear that a reasonable examiner would have found the reference very material in determining the patentability of appellant's resinous composition.

Appellant has argued that the rejections in the two reissue applications do not establish that the original examiners would have relied on the Sattler patent in the prosecution of the original patents since during the reissue proceedings that reference was not combined with any of the references cited in the original proceedings. Specifically, it is urged that the examiner's failure to reject product-by-process claim 11 of the '526 reissue application over the Cummings reference[9] supports that contention. As repeatedly argued by counsel, no references cited during the original prosecution, unlike Sattler, disclosed appellant's adduct and curing agent combination. Cummings disclosed an epoxy-amine adduct and an isocyanate curing agent. Although the isocyanates of Cummings were unblocked, appellant says that this is not material since the isocyanates of the present claims also unblock during curing. Even if we accept appellant's assertion as correct, there is no reason to assume that the examiner in rejecting the original claims would not have considered and relied on the Sattler patent, a reference disclosing appellant's claimed adduct and curing agent, alone or as support in combining the earlier cited references. There is, in a word, no doubt that Sattler was material under the PTO standard.[10]

---

**8.** This "clearly erroneous" test also applies to factual determinations made by the PTO Board. *See In re Caveney,* 761 F.2d 671, 674, 226 USPQ 1, 3 (Fed.Cir.1985); *In re Longi,* 759 F.2d 887, 892, 225 USPQ 645, 648 (Fed.Cir.1985); *Stock Pot Restaurant, Inc. v. Stockpot, Inc.,* 737 F.2d 1576, 1578–79, 222 USPQ 665, 666–67 (Fed.Cir. 1985).

**9.** The Cummings reference, U.S.Patent 3,617,-367, was one of the references cited during the

prosecution of the original application leading to the '299 patent.

**10.** *Driscoll v. Cebalo,* 731 F.2d 878, 885, 221 USPQ 745, 751 (Fed.Cir.1984), makes it clear that the present PTO standard, 37 C.F.R. § 1.56(a), *supra* note 6, codifies the PTO policy on fraud and inequitable conduct as of the times the '050 and '299 patents were being prosecuted in the PTO.

## C. *Intent*

■ In determining whether "inequitable conduct" has occurred, intent need not be proven by direct evidence or by proof of deliberate scheming. *J.P. Stevens*, 747 F.2d at 1560, 223 USPQ at 1092. A permissible finding of gross negligence is sufficient and can be shown where appellant's attorney knew or should have known that the withheld reference would be material to the PTO's consideration. *Driscoll v. Cebalo*, 731 F.2d 878, 885, 221 USPQ 745, 751 (Fed.Cir.1984).

The Board found no clear and convincing evidence that, believing the Sattler patent to be relevant, appellant or his attorney deliberately withheld the reference. However, the Board found, after a thorough and careful examination of the pertinent facts, a "relatively high degree of intent established under the facts of this case" in that (1) appellant's counsel should have known that there was a substantial likelihood that a reasonable examiner would have considered the Sattler patent material in determining the patentability of the original patents and (2) the attorney's subsequent failure to disclose the reference to the PTO constituted reckless and grossly negligent behavior. Evidence relied on by the Board demonstrated that appellant's counsel was repeatedly confronted with the Sattler patent, and its contents, during the time of the prosecution of the original Jerabek patents. The record reveals that counsel used the Sattler patent in an opposition to a Japanese application, filed by M & T Chemicals, Inc. (M & T), relating to cationic deposition. In a letter, dated October 7, 1975, written to a Japanese associate, counsel suggested that, in connection with the opposition, the Sattler patent and one other Canadian patent, Hudson, were "the most pertinent art." [11] In analyzing the importance of the Sattler patent, counsel stated expressly that the reference disclosed "epoxy condensation polymers reacted with amines and then combined with blocked isocyanates." Alternatively, counsel urged that, in the event of an unsuccessful opposition, the Sattler patent should be used to force M & T to limit their claims to exclude PPG's compositions based on the epoxy condensation product.

After the opposition to the Japanese application, counsel in January 1976 amended the method claims in the application for the '299 patent to include the "acid solublized" limitation (*see* claim 1 of the '299 patent, *supra*, Part I). He also added the product by process claim 11 at that time. In a like manner, claim 1 of the application for the '050 patent was amended on April 15, 1976. While the record is silent on the reasons for these amendments, there is solid evidence that, in June 1978, counsel considered the Sattler patent to be so important in connection with the British counterpart of the application for the '050 patent that he cited the reference to English counsel with the suggestion that the composition claims be specifically limited in accordance with these earlier United States amendments. [12]

In reviewing the evidence, we are satisfied that the Board's findings of gross negligence were based on clear and convincing evidence and are not clearly erroneous. It follows that one may properly infer an intent to mislead the PTO from counsel's failure to disclose the Sattler reference. *See Argus Chemical Corp. v. Fibre Glass-Evercoat Co., Inc.*, 759 F.2d 10, 14–15, 225 USPQ 1100, 1103 (Fed.Cir.1985). In the light of the attorney's clear awareness of the closeness of the Sattler patent to appellant's inventions for which applications had been made for U.S. patents, the Board did not have to accept appellant's countering arguments that counsel was not grossly negligent in failing to disclose the reference since (1) any perception by him of the

---

11. Letter from William J. Uhl to Tauguo Yamasaki (October 7, 1975) (discussing opposition to M & T's Japanese application).

12. The record also shows that, when the amendments to the U.S. application were made in 1976, counsel argued against the combination of Hudson, the Canadian reference cited by counsel in the Japanese opposition, and Cummings because the combination failed to suggest appellant's claimed resin.

pertinence of the Sattler patent was eclipsed by a newly cited reference and (2) counsel's arguments during the prosecution of the original patents were limited to aqueous, cationic electrodeposition compositions. The Board's finding of "a relatively large degree of intent" was by no means clearly erroneous, if erroneous at all.

## D. *Conclusion*

 Balancing materiality and intent— both properly found to have existed in high measure—we must conclude that "inequitable conduct" occurred through the gross negligence of appellants' counsel in failing to disclose to the PTO a very significant reference. Accordingly, the Board's rejection of reissue applications '291 and '526 under 35 U.S.C. §§ 131 and 132 for violation of the duty of disclosure is

AFFIRMED.[13]

13. Because of our disposition of this case, we do not find it necessary to pass on the PTO's motion to dismiss the appeal as to reissue application '526 for lack of subject matter jurisdiction on the grounds that the Board's opinion in that application was termed an advisory opinion. If the Board's opinion was in fact advisory, the appeal as to that application would be dismissed. If the Board's opinion was not in fact advisory, we would affirm. In either event, the result would be the same, i.e., the Board's opinion stands.