In re Kozaburo **HARITA, Kukiyoshi Ajisawa, Kinji Iizuke, Yukihiko Kinoshita, Tetsuhide Kamijo, and Michihiro Kobayashi.**

No. 87–1273.

United States Court of Appeals, Federal Circuit.

May 24, 1988.

says "the Trial Court, no doubt, deemed it unnecessary to hand down an injunction" because Rol ceased infringement the day suit was filed. The trial court said nothing, however, and it is for that court to determine in the first instance whether an injunction is warranted under 35 U.S.C. § 283.

George A. Depaoli, Depaoli & O'Brien, P.C., Arlington, Va., for appellant.

Albin F. Drost, Asst. Sol., Office of the Sol., Arlington, Va., for appellee. With him on the brief were Joseph F. Nakamura, Sol. and Fred E. McKelvey, Deputy Sol.

Before RICH and DAVIS, Circuit Judges, and NICHOLS, Senior Circuit Judge.

RICH, Circuit Judge.

This appeal is from the decision of the United States Patent and Trademark Office (PTO) Board of Patent Appeals and Interferences (board), 1 USPQ2d 1887, affirming the final rejection by the Special Program Examiner of claims 8–10 of Harita et al. application for reissue, serial No. 802,486, filed June 1, 1977. We reverse.

This reissue application, filed pursuant to 35 U.S.C. § 251, has as its primary purpose the correction of error in applicants' issued patent No. 3,940,422 ('422 patent) granted February 24, 1976, in that the patent contains claims which read on prior art which came to the attention of the applicants after they filed their application for said patent on January 17, 1974, but before the patent issued. Some of the prior art surfaced as a result of an action dated January 28, 1975, of the French patent office on a counterpart application and became known to applicants in February 1975, resulting in further searching which disclosed the rest of the prior art here involved.

Because the prior art, the materiality of which is unquestioned, was not disclosed to the PTO until the filing of this reissue application, an issue has been raised of "inequitable conduct" in connection with the prosecution of the application for the original patent. This reissue application was examined in the usual way in Group Art Unit 126 on its merits to the point where, on June 18, 1979, applicants were notified that claims 8–10 were in condition for allowance. On July 30, 1979, they were further notified that the sending of that notice was an inadvertence and that the claims (though found to be patentable over the prior art) were being reconsidered in the Office of the Assistant Commissioner for Patents. It is in his office that the "Special Program Examiner" is to be found and his function is to consider issues of violation of the duty of disclosure to the PTO as prescribed in 37 CFR 1.56, among other things. On June 19, 1984, he issued a final rejection of claims 8–10
based upon the violation by applicants'
Japanese attorney, Akira Agata, of the

duty of disclosure through bad faith (fraudulent intent) or gross negligence (gross and reckless misconduct) in connection with application Serial No. 434,-252 [for the patent sought to be reissued], an application upon which the instant application [for reissue] relies.

From that rejection applicants appealed to the board, the board affirmed, and this appeal followed.

On the appeal to the board, the same Special Program Examiner, by way of a brief to the board stating the PTO position, filed an extensive Examiner's Answer. As may be observed from the published board opinion, the board wrote less than a single printed page in the course of which it said: "we shall adopt the examiner's position as our own" and "[w]e emphasize our complete agreement with the examiner's position." It then attached as an appendix to its short opinion the full Examiner's Answer of some six printed pages. The position stated in that document from the Office of the Assistant Commissioner for Patents is therefore virtually what is on appeal here and is a full statement of the PTO's position.

## BACKGROUND

### The Cast

Kissei Pharmaceutical Co., Ltd., is the real party in interest. It is a Japanese corporation located in Japan not very active in the patent field. It filed its first patent application before 1970 and the 1974 application for the patent here involved was only the second it had filed and the first Kissei had ever filed in the United States. Mr. Maruyama, its Head of the Development Department 1968–79 and thereafter Head of the Research & Development Department, has been its spokesman in this case.

Mr. Harita and five other employees of Kissei are the named inventors in the patent and reissue application here involved. Harita's title 1971–76 was Head of the Chemical Research Division of the Development Department. He retired from the company in 1976 and went to work for the patent firm of Mizushima & Aoyama in Osaka, Japan.

Mr. Agata, already mentioned above, was the Japanese patent attorney or agent employed by Kissei to file the applications for patent here involved and had his office in Tokyo. For 12 years he had been an examiner and judge in the Japanese Patent Office, opening his own office in 1968.

Mr. Ajisawa was the second-named inventor on the patent application and was used by Kissei and Harita as their representative in dealings with Agata who, in turn, used him as his contact with his corporate client. The other four inventors play no roles in the events herein.

Mr. Daniel, a U.S. patent lawyer in Arlington, Virginia, was selected by Agata to file the U.S. application which resulted in the patent. However, in filing the reissue application, present counsel, Depaoli & O'Brien, P.C., also of Arlington, were employed, Mr. Depaoli arguing this appeal.

### The Events

Mr. Agata, having filed a Japanese application for Kissei on January 18, 1973, prepared and sent an English language version to Daniel to be filed within the convention year. It was properly executed by the inventors and on letter-size paper. Daniel, believing he should put it on legal-size paper, made some minor alterations in the language—"cosmetic and stylistic editing" he called it—had it retyped on legal-size paper and filed it in the PTO on January 17, 1974, the day before the end of the convention year, claiming "priority" on the basis of the Japanese filing date.

The record shows that the U.S. application, handled throughout by Daniel, had a normal and uncomplicated progress through the PTO with a first action citing some references which were overcome by argument, an amendment adding two method of use claims to the original seven product claims, a final rejection dropping the art rejection, some minor claim amendments to overcome non-reference rejections, and a restriction requirement as to the new claims. The application was allowed and the patent issued February 24,

1976, about 25 months after the application was filed. Daniel knew of no reason why it should not be issued. He was not told of the new prior art which had become known to Kissei.

Daniel, in reporting to Agata on his response to the first Office action, explained his reasons for adding the method of use claims. The application describes and claims a group of compounds useful for treating asthma, hay fever, etc., and he had noted that methods of treating these allergies were disclosed. He thought it would be advantageous to Kissei to claim the method and gave Agata a lengthy explanation a part of which the PTO uses to support its claim of inequitable conduct on which it rests its rejection. That part is quoted below, being preceded by an explanation that restriction would probably be required and that a divisional application would then have to be filed on the method, a prediction which materialized. The date of this letter is 11 October 1974 and it is Exhibit 11 attached to an Agata declaration.

> There are conceivable reasons favoring the filing of a method divisional case. First, since the prosecution of such a case will take some time, any patent issuing thereon will expire several years later than any patent issuing on the present application and thus give the applicants a longer monopoly period. More importantly, if some one [sic] should uncover a disclosure any where [sic] in the technical literature of any compound within the scope of the present claims, *such claims would be invalidated.* Even though the Examiner has so far brought to light no truly pertinent prior art, the Examiner's search cannot be considered absolutely complete and the possibility of some species of the present generic claims being known seems to me to be within the realm of possibility. The discovery of the present medical utility for the class of compounds would be considered a patentable invention even if the compounds themselves were old as such (assuming, of course, they had never been used for analogous medical utility). Hence, *a patent directed to the*

> *medical use method would not be invalidated by prior art teaching a species of the genus of compounds in question.* In order to lay an effective procedural basis for filing a new divisional case if your client decided this is desirable, I have included simple method [of] use claims now. [Emphasis ours.]

The foregoing is extracted from a three-page letter dealing also with other matters. Daniel had written along similar lines on January 29, 1974, after he filed the application. Daniel dealt exclusively with Agata and had no contact with Kissei or the inventors.

Agata meanwhile had filed and was in charge of applications corresponding to the U.S. and Japanese applications in twenty other countries. February 10, 1975, he received notice of an action by the French patent office citing a reference, Chemical Abstracts, Vol. 71 (1969) No. 3354V, disclosing compounds within the scope of the claims of the U.S. application which he reported to Kissei. This caused Kissei to search further in Chemical Abstracts and other prior art was found on which the claims read.

Inventor Ajisawa thereupon advised attorney Agata about this additional prior art and its significance with respect to the invention, asking Agata whether it was necessary to call the art to the attention of the U.S. PTO. Agata advised Ajisawa that it was not necessary, about which more will be said later.

Since Daniel dealt only with Agata, Kissei and all of the inventors had no contact with Daniel and, furthermore, had no prior experience with United States PTO practice nor any knowledge thereof. Ajisawa reported Agata's advice to his employer and no further action was taken on the U.S. application from Japan, it took its normal course, and the patent issued some eleven months later on February 24, 1976. All of the claims in the patent were, unfortunately, invalid for overclaiming because of a want of awareness by the examiner and by Daniel of the closest prior art, which is not a rare occurrence in the annals of patent

law. That is one reason we have a reissue statute.

The next event, however, is certainly rare. Harita, after the issuance of the U.S. patent, retired from Kissei and obtained employment in the office of a Japanese patent attorney, Mr. Aoyama. There he began to familiarize himself with the regulations of the U.S. PTO and realized that the newly found prior art should have been disclosed to the PTO—that Agata's advice had been wrong. He informed Kissei and steps were taken to file the application for reissue now before us through new U.S. attorneys. The reason or motive for their selection is not disclosed in the record, nor do we attach significance to it.

The grounds for reissue were the classic ones that the patent is "inoperative," within the meaning of 35 U.S.C. § 251, to protect the invention "by reason of the patentee claiming more ... than he had a right to claim in the patent." The reissue application was filed with reasonable promptness under all the circumstances, about fifteen months after the patent issued, with no other motivation than the discovery that the patent was defective in that its claims were too broad and read on prior art.

The declaration accompanying the reissue application recites all of the prior art that should have been called to the examiner's attention, the application has been examined in the light thereof on its merits and, as indicated above, the claims have been found to be patentable over the prior art. Except for the "inequitable conduct" rejection by the Special Program Examiner, the reissue application is in condition for allowance. We will now summarize the events occurring during his prolonged review of the reissue application.

The application having been transferred to the Office of the Assistant Commissioner for Patents on or about July 30, 1979, to be "reconsidered under the provisions of M.P.E.P. 721.01" (now replaced), a first "Requirement for Information" was issued on April 1, 1980. This 9–page single-spaced document submits to "All applicants" 14 questions; to the assignee 6 questions; to Japanese Counsel 8 questions; and to U.S. Counsel 5 questions. Two months were allowed for response. With a time extension, responses were filed July 29, 1980.

July 2, 1981, nearly a year later, a second Requirement for Information issued (8 pages) suggesting Agata had "deviated from normal practice in not seeking advice from U.S. counsel and that more information was needed to "determine the seriousness of this deviation." It also suggested that Mr. Daniel's answers had raised the additional issue of alteration of the specification by him after execution and serious misconduct on his part. Agata was asked 6 questions, Daniel 9 questions. Responses were filed November 2, 1981.

June 2, 1982, seven months later, a third Requirement for Information (7 pages) issued: 8 questions for Agata; 7 main questions with numerous subquestions for "Each of The Inventors and Akio Maruzama as Assignee" (which he was not) and for Mr. Ajisawa, about 12 in all, including inquiries into relations between Kissei and a U.S. corporation with relation to the patent and asking for all correspondence with that corporation touching on the validity of the patent, and 7 questions for Daniel including this one:

> 7. Did you ever revise, alter, edit and or retype applications previously sworn to, without reexecution, before filing said applications in the Patent and Trademark Office? Include in your explanation the serial number(s) of such case(s).

From the table of contents of the reissue application file wrapper it appears that this extraneous inquiry resulted in proceedings between Mr. Daniel and the PTO which consumed approximately a year and seven months (about which we are uninformed) which came to nothing so far as the application before us is concerned as indicated by the following statement in the Examiner's Answer which is the Appendix to the board opinion under review, 1 USPQ2d at 1888:

> The alterations made by Mr. Daniel in the specification and claims of the parent application after execution by the inven-

tors have been found to have been editorial in nature and not to warrant the striking of this reissue application. [Review of Facts, par. 3.]

(Striking was the only possible action at the time under then existing 37 CFR 1.56. The use of the term "parent application" for the original patent sought to be reissued appears to be a misnomer. There is no continuity between such an application and a reissue application. "Parent" implies copendency. Years may intervene between the issuance of a patent and an application to reissue it. There is never copendency.)

After its nearly four and a half years of investigation of everyone connected with the application for the original patent, including an attempted side investigation of Mr. Daniel on other applications, the Special Program Examiner rejected claims 8–10, found allowable by the art examiner over the prior art, including the new prior art discovered during the prosecution, on the sole ground that Akira Agata, the Japanese attorney, did not disclose the newly discovered art to the PTO *before the patent issued.* The PTO, notwithstanding its long investigation, has made no charge that any other party or attorney involved in this case failed in its duty to the PTO. It predicated the rejection, moreover, on 37 CFR 1.56(d), a rule which was not adopted by the PTO until January 28, 1977, which was nearly a year after the issuance of the patent here sought to be reissued. The language used by the Special Program Examiner in formulating his rejection is taken directly from § 1.56(d)(2) though no such language existed in the PTO Rules as of the time the acts complained of were committed. Since this case turns solely on the conduct of Mr. Agata, we now examine in more detail what the PTO investigation turned up about it.

### Agata's Explanations

By way of background, we first mention what is stated in the reissue application declaration about the discovery of new prior art and what was done next. It explains how in early 1975 Agata gave Ajisawa, one of the inventors, a copy of the French office action citing the Chemical Abstracts item which led to further search at Kissei leading to two other like items. It further explains that at Kissei it was appreciated that this art anticipated claims in the U.S. application, but that none of the inventors or any other employees of Kissei had any familiarity with U.S. PTO practice and had never before filed a U.S. application. Ajisawa therefore asked Agata whether it was necessary to call this new art to the attention of the PTO and was told by Agata that it was not necessary. Of course, this was bad advice because it was wrong advice, but the question for us, since he alone is charged with "inequitable conduct," is why he gave it and acted in accordance with it himself.

Answering PTO questions, Agata explained how he had been an employee of the Japanese patent office for 12 years and had resigned to take up his own practice in 1968 and, when asked to file U.S. applications, relied on U.S. attorneys' knowledge of U.S. practice and knew only what he had picked up incidentally. He said he had no knowledge of Rule 1.56. Asked why he advised his client it was not necessary to bring the newly found articles to the PTO's attention, he declared:

> That he did not recommend citation of the articles to the United States Patent and Trademark Office because in Japanese Patent practice neither inventor(s), assignee(s), nor Patent Attorney(s) have any duty to bring any prior art which is uncovered after filing to the attention of the Japanese Patent Office, so he thought this was also applicable to U.S. Patent practice.

On the second request for information, Agata stated, inter alia, that

> under the Japanese Patent Law, there is no provision which specifically stipulates that the applicant must bring to the Examiner's attention the prior art which was known before the application of the patent or which will be known after filing the application.
>
> . . . .
>
> According to the Japanese Patent Practice, it is not obligatory to bring the

newly found prior art after filing to the attention of the Japanese Patent Office and he thought that this was also applicable to foreign patent practice.

On the third round of questions, Agata's attention was called to the fact that he had admitted to the filing of a voluntary amendment deleting known compounds from the Japanese application and was asked why he had not done so in the U.S. application. In reply, he pointed out that the Japanese amendment was filed, on his client's instruction, June 29, 1977, which was *after the U.S. reissue application had been filed.* He further explained

> That at the time he became aware of prior art disclosing compounds within the scope of the claims of U.S. application 434,252, i.e. about February or March 1975, said United States application was in process of examination by the Examiner and he thought that it was impossible to file a voluntary amendment deleting known compounds and considered that when such prior art was applied to said United States patent application by the Examiner or a third party, an amendment deleting known compounds should be filed in the United States Patent and Trademark Office;

that being what the practice was in Japan, as he also explained in detail. *See* T. Tenabe & H. Wegner, *Japanese Patent Law,* 58 J.Pat.Off.Soc'y 565, 584 (1976) ("Patent Fraud" in the American sense does not exist in Japan).

## ISSUE

Was this reissue application properly rejected by the PTO "under 37 CFR 1.56(d)" because of a "violation by applicants' Japanese attorney, Akira Agata, of the duty of disclosure" of anticipatory prior art which became known to him during the prosecution of application Serial No. 434,252 for the patent sought to be reissued, which patent issued February 24, 1976?

## OPINION

We first wish to make it clear that the decision herein is based on the particular and peculiar facts of this case with no intent whatsoever to create a precedent applicable to different fact situations. *See FMC Corp. v. Manitowoc Co.,* 835 F.2d 1411, 1417 n. 12, 5 USPQ2d 1112, 1117 n. 12 (Fed.Cir.1987) *citing In re Ruscetta,* 255 F.2d 687, 689, 118 USPQ 101, 103 (CCPA 1958) (decisions should be construed in accordance with the precise issue before the court).

Secondly, though we are reviewing a rejection not made until June 19, 1984, we note that all of the acts relied on to support it took place much earlier, in the course of the year between February or March of 1975 and the issuance of appellants' patent, No. 3,940,422, on February 24, 1976. In the intervening dozen years, the applicable rules of law and the practice pertaining to the disclosure of prior art to the PTO have undergone substantial development and change and, indeed, are still doing so. *See* 35 Pat. Trademark & Copyright J. (BNA) at 320, (Feb. 25, 1988) (proposed substitute for § 1.56). What was once simply called "Fraud on the patent office," at least in its violation of a duty to disclose aspect, now bears the name "inequitable conduct" and is governed by rules first promulgated on January 28, 1977, and amended in 1982, 1983, 1984, and 1985. We therefore deem it essential to consider this case in light of the situation as it existed when the acts deemed to bar this reissue took place. *Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 1551, 220 USPQ 193, 201 (Fed.Cir. 1983) ("we are not at liberty ... to apply the present standard retroactively"). For a review of the situation in 1976, *see* Tegtmeyer, *Fraud on the Patent and Trademark Office under Rule 56,* 58 J.Pat.Off. Soc'y 550 (1976). There was then a PTO rule designated 37 CFR 1.56 which was quite different from the present rule of the same number. It read in its entirety:

§ 1.56 Improper applications.

Any application signed or sworn to in blank, or without actual inspection by the applicant, and any application altered or partly filled in after being signed or sworn to, and also any application *fraudulently* filed or in connection with which any *fraud* is practiced or attempted on

the Patent and Trademark Office, may be *stricken* from the files. [Emphasis ours.]

We are not here concerned with the first part of the rule, before the words "and also," dealing with execution and altering applications (though the PTO spent much time on that aspect in pursuing Mr. Daniel), but only with the "fraud" provision.

During the past decade, this simple rule has evolved into the present ten-paragraph provision which occupies nearly two pages of 37 CFR and is now entitled "*§ 1.56 Duty of disclosure; fraud; striking or rejection of applications.*" The PTO mischaracterizes it as a "codification"—a word of very elastic meaning—the fact being that it has inaugurated a whole new way of life in the prosecution of patent applications. The rule begins with a recital of "A duty of candor and good faith toward the" PTO which has effectively made applicants, their associates, and attorneys partners with the PTO examining corps in producing for PTO consideration the prior art which is needed to operate a reasonably effective examination system. As a part of this partnership arrangement came the enhanced "duty of disclosure" concept and provisions, violation of which has come to constitute, in the PTO, not "fraud" but "inequitable conduct," the penalty for which is, not "striking" of an application as in the above quoted old rule, but rejection of all claims under 35 U.S.C. § 131 and § 132, which is another innovation. Still another change is that such a rejection has been made appealable to the Board of Appeals and Interferences.

This court has had a seat on the stage during all of this evolution and has frequently been called upon to participate in the action. We are now doing so again.

■ It has become thoroughly established that inequitable conduct of the violation of duty of disclosure variety must be established by clear and convincing evidence. Indeed, the current Rule 1.56 so specifies in paragraph (d). What must be so established is (1) the "materiality" of the undisclosed, suppressed, or misrepresented prior art or statutory bar and (2) the intent

of the person not disclosing to thereby deceive or mislead the PTO. In this case, materiality is not an issue because it is not contested that the Chemical Abstracts items disclosed to the PTO in the reissue application anticipate the original patent claims. We therefore have only intent to consider.

In *FMC Corp. v. Manitowoc Co.*, supra, 835 F.2d at 1415, 5 USPQ2d at 1115, in a careful summation of the subject, this court said:

"Inequitable conduct" is not, or should not be, a magic incantation to be asserted against every patentee. Nor is that allegation established upon a mere showing that art or information having some degree of materiality was not disclosed. To be guilty of inequitable conduct, *one must have intended to act inequitably.* Thus, one who alleges a "failure to disclose" form of inequitable conduct must offer clear and convincing proof of: ... (3) failure of the applicant to disclose art or information *resulting from an intent to mislead the PTO.* That proof may be rebutted by a showing that: ... (d) ... applicant's failure to disclose art or information *did not result from an intent to mislead the PTO.* [Emphasis added.]

While that was said in the context of inter partes litigation on a patent, it applies equally to a dispute between applicants for reissue of a patent and a Special Program Examiner in the office of the Assistant Commissioner for Patents claiming fraud or inequitable conduct. Thus the question here is: Has the PTO established that Mr. Agata had an intent to mislead the PTO?

■ Upon consideration of all the evidence the PTO has produced as a result of its four and a half years of effort and inquiry, even if we assume a prima facie showing of intent on the part of Mr. Agata, the record as a whole overcomes that inference. Beyond question, there is no evidence of any *misstatement* in the prosecution of the U.S. application. There is no evidence of any deliberate scheming. After knowledge of the new prior art was acquired by Mr. Agata, all the evidence shows is that he communicated nothing to

the U.S. attorney Mr. Daniel. His only sin was silence, and he had his reasons for it. When he finally came to comprehend the true situation respecting U.S. PTO practice, by which time the U.S. patent had issued, steps were taken to file a reissue application for the dual purpose of cancelling the anticipated claims and advising the PTO of the newly-found prior art. We see no inequitable conduct and no valid reason why the reissue should not issue.

This court and its predecessor have repeatedly pointed out that the reissue statute, 35 U.S.C. § 251, is remedial in nature, based on principles of equity and fairness, and should be liberally construed, *In re Weiler*, 790 F.2d 1576, 1579, 229 USPQ 673, 675 (Fed.Cir.1986), and cases cited. In any given case, the statute should be so applied to the facts that justice will be done both to the patentee and the public, *Slimfold Mfg. Co. v. Kinkead Indus. Inc.*, 810 F.2d 1113, 1116, 1 USPQ2d 1563, 1566 (Fed.Cir.1987), citing *In re Willingham*, 282 F.2d 353, 354–55, 127 USPQ 211, 214 (CCPA 1960).

The Solicitor's brief devotes only a page to the intent issue and in effect admits there is no direct evidence of intent to mislead, asking us to presume or infer intent from other showings such as Agata's knowledge of the materiality of the new references. He says "subjective good faith does not negate inequitable conduct," citing *Argus Chemical Corp. v. Fibre Glass-Evercoat Co.*, 759 F.2d 10, 14, 225 USPQ 1100, 1103 (Fed.Cir.), *cert. denied*, 474 U.S. 903, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985). Inequitable conduct, however, is the ultimate legal conclusion based on materiality and intent and we are concerned only with rebuttal of the charge of intent. *Argus* involved very different facts. The U.S. attorney handling the patent application knew of an actual § 102(b) "on sale" time bar and amended original claims which it would invalidate so that they would not read on it, without telling the PTO about the bar, on the tenuous "good faith" theory that only references which fully anticipated the claims had to be disclosed, despite our precedent to the contrary. Thus a threshold intent was established which was sufficient, under the circumstances, to find inequitable conduct. The Solicitor also speaks of "misrepresentations," but, as stated above, none are involved here because there were no representations at all.

In sum, the PTO's case on intent to mislead, as it was in the Examiner's Answer and consequently in the board opinion which adopts it, is that we should infer it from Agata's "gross negligence," whatever that may be taken to mean. Of course, as an *ideal* Japanese patent agent he should have known more about U.S. PTO rules and practice and developing case law, but we deal here with the realities of what actually happened. We think we should not infer merely from some vague thing called "gross negligence" an intent which it was the PTO's obligation to establish and especially that we should not infer it in light of detailed rules of procedure enacted long after the events in this case took place. We therefore hold intent has not been proved. What was said on the subject of inference from gross negligence in *FMC Corp. v. Manitowoc* has a bearing here, 835 F.2d at 1416, 5 USPQ2d at 1116:

> [A]n applicant who knew or should have known of the art or information, and of its materiality, is not automatically precluded thereby from an effort to convince the fact finder that the failure to disclose was nonetheless not due to an intent to mislead the PTO; i.e. that, in light of all the circumstances in the case, an inference of intent to mislead is not warranted. No single factor or combination of factors can be said always to *require* an inference to mislead;....

The opinion goes on to say the patentee may have a difficult time and that a mere denial of intent will not suffice and then proceeded to sustain the district court's findings of, inter alia, no intent. The district court had *refused to infer* intent.

On the whole record, we hold that the PTO's finding of the requisite intent is clearly erroneous and therefore the board's affirmance of the Special Program Examiner's final rejection of claims 8–10 is *reversed*.

REVERSED.

DAVIS, Circuit Judge, dissenting.

I would affirm because, in my view, Mr. Agata was guilty at least of gross negligence and therefore of inequitable conduct toward the Patent and Trademark Office (PTO).

1. The record facts (unchallenged by the majority) show the following: Shortly after the original application was filed with the PTO (in January 1974), Mr. Daniel (the American patent attorney prosecuting the application before the PTO) wrote to Mr. Agata (the Japanese patent agent) two letters, each cautioning that a newly-found (but prior) disclosure of a compound within the scope of the application's claims would invalidate those claims. Such material prior art was disclosed in January 1975 and soon became known to one of the inventors (Ajisawa) who specifically asked Mr. Agata whether it was necessary to call that prior art to the attention of the PTO. Agata advised that it was not necessary to do so. At that time Agata affirmatively considered that prior art as material. The reasons later given by Mr. Agata were that (a) in Japan there is no such requirement to reveal prior art and (b) Agata's knowledge of U.S. patent practice was limited. He has also admitted, however, that for U.S. patent applications "he would rely on United States Attorneys for their knowledge of U.S. patent practice." Nevertheless he did not, at the time, contact Mr. Daniel for advice with respect to disclosure of this prior art (or even tell Daniel of the newly-found existence of this prior art). The patent issued in February 1976, and it was only thereafter that this prior art was disclosed to the PTO in connection with the reissue proceeding. Before the issuance of the patent, there was correspondence between Messrs. Daniel and Agata about voluntary amendments to the U.S. application's claims, and therefore Agata knew that such a voluntary amendment (correcting a claim that had been too broadly or inartfully drafted) was permissible in U.S. patent practice.

2. For me, Agata's conduct, in failing to take up the matter with the U.S. patent prosecutor, before the patent issued, amounted to gross negligence (at the very least). He was an experienced Japanese patent practitioner and he knew the newly-discovered prior art was material. He had been specifically asked by one of the inventors whether he should report the new disclosure to the PTO. He knew that his understanding of U.S. patent practice was limited. He knew he should rely on Mr. Daniel for knowledge of U.S. patent practice. He knew that voluntary amendments restricting over-broad claims (in the application) were allowable in U.S. patent practice, and he had been warned about the effect (during prosecution) of disclosure of compounds within the scope of the then claims. Nevertheless he did nothing, before the patent issued, to alert either Mr. Daniel or the PTO. The PTO considered all this to reveal gross negligence on Agata's part—and I agree that it was so shown by clear and convincing evidence.

3. "Gross negligence" is one form of inequitable conduct specified in the July 1982 patent rule embodied in 37 C.F.R. § 1.56(d), and this court has accepted that foundation for showing the proper measure of intent, especially where, as here, there is a high level of materiality.[1] *See Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 993 (Fed.Cir.1988); *Akzo, N.V. v. E.I. DuPont de Nemours,* 810 F.2d 1148, 1153, 1 USPQ2d 1704, 1708 (Fed.Cir.1987); *In re Jerabek,* 789 F.2d 886, 891, 229 USPQ 530, 533 (Fed.Cir.1986); *J.P. Stevens & Co. v. Lex Tex Ltd.,* 747 F.2d 1553, 1560, 223 USPQ 1089, 1092 (Fed.Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985); *Driscoll v. Cebalo,* 731 F.2d 878, 884–85, 221 USPQ 745, 751 (Fed.Cir.1984); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1363, 220 USPQ 763, 773 (Fed.Cir.); *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

4. The majority seems to suggest that in 1975–76 the requirements for finding inequitable conduct were stricter and did

[1] In this case the Board said: "The materiality of the undisclosed prior art evidence in the present case was incontrovertible since lack of novelty is a bar to patentability in virtually every patent statute in the world." This factual finding must be upheld because it is not clearly erroneous. *In re Jerabek,* 789 F.2d 886, 889–90, 229 USPQ 530, 532–33 (Fed.Cir.1986).

not encompass "gross negligence" (without more). However, the March 1977 version of 37 C.F.R. 1.56 expressly referred to "gross negligence" as a basis for a determination of inequitable conduct. In addition, our precedents reiterate that the later versions of Rule 56 generally embody the PTO policy as it earlier existed. *See In re Clark*, 522 F.2d 623, 627, 187 USPQ 209, 212–13 (CCPA 1975); *Driscoll v. Cebalo*, 731 F.2d at 884–85, 221 USPQ at 750–51, and cases cited; *Argus Chemical Corp. v. Fibre Glass–Evercoat Co.*, 759 F.2d 10, 13–14, 225 USPQ 1100, 1102 (Fed.Cir.), *cert. denied*, 474 U.S. 903, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985).[2] In particular, it was plain, in 1975–76 as today, that prior art of the high level of materiality of the prior art in this case should have been disclosed to the PTO.

5. Here, too, as in *Jerabek*, 789 F.2d at 892, 229 USPQ at 534, "[b]alancing materiality and intent—both properly found to have existed in high measure—[I] must conclude that 'inequitable conduct' occurred through the gross negligence of [Mr. Agata] in failing to disclose to the PTO [or to U.S. counsel] a very significant reference."

---

2. There has been some challenge to the PTO's conclusion that it was merely codifying prior practice (16 AIPLA Q.J. 13–15, 76–81, 134–38 (1988)) but we are bound—until overruled by the court in banc—by the holdings of our prece-

dents. In any event, the 1977 regulation, almost contemporaneous with Agata's refusal to inform the PTO about the newly discovered prior art, explicitly included "gross negligence" as a significant component of inequitable conduct.