867 F.2d 616
 10 U.S.P.Q.2d 1292
 Unpublished Disposition
NOTICE: Federal Circuit Local Rule 47.8(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
SCHERING CORPORATION, Plaintiff/Appellant,
v.
OPTICAL RADIATION CORPORATION, Defendant/Cross-Appellant.
 Nos. 88-1227, 88-1267.
 United States Court of Appeals, Federal Circuit.
 Jan. 27, 1989.
Rehearing Denied Feb. 28, 1989.
 
 Before MAYER, Circuit Judge, NICHOLS, Senior Circuit Judge, and MICHEL, Circuit Judge.
 MICHEL, Circuit Judge.
 
 DECISION
 
 1
 Schering Corporation (Schering) appeals the judgment of the United States District Court for the Central District of California in Schering Corp. v. Optical Radiation Corp., No. 83 CV 84-2357-WPG (C.D.Cal. August 6, 1987) (amended January 5, 1988), holding invalid under 35 U.S.C. Sec. 103 (1982) claims 1 and 2 of U.S. Patent No. 4,390,676 (the '676 patent), issued to Samuel Loshaek and assigned to Schering. Schering also challenges the court's holding that these claims, which describe an intraocular lens with a copolymerizable ultraviolet (UV) light absorber for use by persons without natural lenses (aphakics), have not been infringed by Optical Radiation Corporation's (ORC's) "UV 400" intraocular lens, and that the patent is unenforceable due to inequitable conduct. ORC, in a cross-appeal, challenges the court's conclusion that the claims find support in an application filed June 20, 1973, and also in the court's denial of attorney fees. We affirm as to obviousness, but reverse as to inequitable conduct. We affirm as to the court's denial of attorney fees to ORC.
 
 OPINION
 I.
 
 2
 The district court determined that the prior art includes a contact lens having a UV absorber that is mixed, whether or not actually polymerized (or polymerizable), with the plastic or polymer from which the lens is formed. The UV absorber causes the prior art lens, like the lens claimed by Schering, to have spectral transmittance characteristics that approximate those of a normal (non-aphakic) human eye, absorbing "radiation in the wavelength range of about 340-450 mmu." The court found that the prior art contact lens, described in a sales brochure issued by the manufacturer, Guaranteed Plastic Contact Lens Company (GPCL), 7 or 8 years before the June 20, 1973 filing of the application for the '676 patent, is satisfactory for use as an intraocular lens by aphakics. Indeed, Schering concedes the functionality of the GPCL lens material both as an intraocular lens and a contact lens. In its brief Schering states that "[t]he brochure suggests that the [GPCL] lens could be used for correcting both normal and aphakic vision," Appellant's Opening Brief at 22 (emphasis added), the intraocular lenses being crafted to be "surgically implanted into the aphakic eye to replace the natural lens." Id. at 7, n. 3.
 
 
 3
 The court also determined that a technique of polymerizing a UV absorber into a plastic body was within the prior art. United States Patent No. 3,173,893 issued to Fertig et al., and their article in the Journal of Applied Polymer Science, Vol. 10, pp. 663-672 (1966), discuss techniques for copolymerizing a UV absorber into a plastic object. Both highlight the advantages of UV absorber copolymerization. The Fertig article states that the approach there described "minimize[s] problems such as incompatibility, migration [or leaching], volatility and solvent extraction." Fertig article at 663. The Fertig patent states that two of the advantages achieved with the copolymerized UV absorber are "a complete lack of toxicity as well as the total absence of any migration from the formulated polymer...." See Fertig patent, col. 1, lines 44-48. That is, the Fertig references disclose a copolymerized UV absorber, like that claimed by Schering, which undergoes limited or no leaching.
 
 
 4
 The Fertig references do not specifically single out an ophthalmic lens as the plastic body for which the absorber copolymerization technique could be used. But since a UV absorber leaching problem was known to exist for plastic lenses using "unbound" nonpolymerized absorbers, one having ordinary skill in the art certainly would have realized, upon review of Fertig's technique, that this method could also be applied to ophthalmic lenses to prevent leaching of the UV absorber into the eye.
 
 
 5
 Absence of complete certainty as to whether Fertig's technique could be used successfully for lenses would not undermine such an obviousness conclusion. "Only a reasonable expectation of success, not absolute predictability, is necessary for a conclusion of obviousness." In re Longi, 759 F.2d 887, 897, 225 USPQ 645, 651-52 (Fed.Cir.1985). Furthermore, Fertig need not contain an express statement suggesting the modification of ophthalmic lenses in order for the claimed invention to have been rendered obvious. See Cable Electric Products, Inc. v. Genmark, Inc., 770 F.2d 1015, 1025, 226 USPQ 881, 886 (Fed.Cir.1985).
 
 
 6
 The district court points out that neither the brochure describing the GPCL lens nor the Fertig article was before the examiner during the prosecution of the Schering application. As we indicated in SSIH Equipment S.A. v. United States International Trade Commission, 718 F.2d 365, 375, 218 USPQ 678, 687 (Fed.Cir.1983), where the party challenging validity produces new, more pertinent references which the Patent Office did not consider, that party's burden of overcoming the presumption of validity afforded a patent is more easily carried.
 
 
 7
 Even if the brochure and the article were not more pertinent, that the court based its holding of invalidity on these references would not require reversal. The issue before this court is whether the GPCL brochure and the Fertig article, whether or not considered by the examiner, are sufficiently probative of obviousness to overcome the presumption of validity. See Surface Technology, Inc. v. United States International Trade Commission, 801 F.2d 1336, 1339-40, 231 USPQ 192, 195 (Fed.Cir.1986). Our view is that the references support an obviousness determination.
 
 
 8
 With regard to "secondary considerations," Schering asserts error in the district court's failure to conclude that nonobviousness was shown by the license agreement between Schering and Precision-Cosmet. While evidence of licenses taken by competitors may tend to indicate nonobviousness, the weight to be accorded evidence of "secondary considerations" is to be carefully appraised in relation to all the facts. See Cable Electric, 770 F.2d at 1026-27, 226 USPQ at 887-88. In view of the high evidentiary value of other relevant factors showing obviousness, we do not agree that the district court failed to properly consider the license agreement.
 
 
 9
 In view of the foregoing considerations and the total record before us, we hold that the district court was not clearly wrong with respect to its factual findings on the issues underlying the question of obviousness, nor did it commit legal error in holding invalid as obvious claims 1 and 2 of the '676 patent. See Medtronic, Inc. v. Daig Corp., 789 F.2d 903, 904-05, 229 USPQ 664, 666 (Fed.Cir.1986), cert. denied, 479 U.S. 931 (1986). Therefore, we do not reach the question whether the claims at issue find support in the application then filed, or whether ORC's UV 400 intraocular lens infringes Schering's claims because invalid claims cannot be infringed.
 
 II.
 
 10
 It is settled law of this circuit that threshold levels of materiality and intent each must be found to have been established by the evidence before the court may begin balancing the degree of each so as to determine whether there was inequitable conduct that precludes enforcement of all claims of the patent. J.P. Stevens Co., Inc. v. Lex Tex Ltd., Inc., 747 F.2d 1553, 1559-60, 223 USPQ 1089, 1092 (Fed.Cir.1984), cert. denied, 474 U.S. 822 (1985). Here the district court did make a specific finding as to materiality, but not as to intent. Furthermore, based on the entire record before us, our view is that if the district court had focussed on the question of intent, it would have committed clear error in finding threshold or higher level intent. See In re Jerabek, 789 F.2d 886, 889, 229 USPQ 530, 532 (Fed.Cir.1986).
 
 
 11
 Moreover, we will not infer a finding of intent merely because of the district court's finding of materiality and because even without finding intent, it nevertheless concluded that Schering had committed inequitable conduct. As we recently stated in Kingsdown Medical Consultants, Ltd. v. Hollister Inc., No. 88-1265, slip op. at 19 (Fed.Cir. December 21, 1988) (in banc decision with regard to intent element of inequitable conduct), even a finding of "gross negligence" does not of itself justify an inference of intent to deceive. Nor does its opinion indicate that the court conducted the required weighing process or was aware that "intent to deceive" the Patent and Trademark Office, as distinct from knowledge of the uncited reference, is an essential element of inequitable conduct. But apart from materiality "the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." Id. (citation omitted). Accordingly, the trial court holding that the patent is unenforceable because of inequitable conduct must be reversed.
 
 
 12
 It is true that in analyzing whether to award attorney fees, the district judge did state (pp. 6, 13, and 14, Memorandum Decision of August 6, 1987, and p. 2, Order of January 5, 1988, respectively) that the GPCL lens brochure was "known to" plaintiff, but "plaintiff made no mention" of it, that the "failure of the plaintiff to make such disclosures constituted inequitable conduct," and that attorney fees should not be awarded because "plaintiff knowingly withheld" it. None of those statements, however, was or was denominated a finding of fact, and from the context none of these statements can be seen to be a finding of fact of threshold intent required by our cases before a court may hold a patent unenforceable for inequitable conduct. Indeed, deceptive intent for purposes of unenforceability for inequitable conduct was plainly not even the issue being discussed in any of these instances. All but one related to materiality (which was clear) or to knowledge (which was admitted). The remaining statement (p. 14) related to whether an award of attorney fees was warranted in the exercise of the court's equitable discretion. The district judge, thus, determined inequitable conduct (p. 14) without any finding of deceptive intent. In addition, the court nowhere purported because of "inequitable conduct" to invalidate claims of the patent that were not even in dispute in this case, nor expressed any awareness that this would be the inevitable consequence of its conclusion of "inequitable conduct."
 
 
 13
 Therefore, we do not overrule a fact finding on intent, but instead determine that, as a legal matter, the very absence of a finding of deceptive intent precludes a determination of unenforceability for inequitable conduct.
 
 III.
 
 14
 "A decision concerning the award of attorneys' fees is reviewable only to determine whether the court has abused its discretion." J.P. Stevens Co., Inc. v. Lex Tex Ltd., Inc., 822 F.2d 1047, 1050, 3 USPQ2d 1235, 1237 (Fed.Cir.1987). Even where, as here, the court finds the case "exceptional," the trial court, acting within its discretion, is free not to award attorney fees based on other considerations which it is best able to weigh. See J.P. Stevens, 822 F.2d at 1051, 3 USPQ2d at 1238. In view of the broad discretion permitted the district court, and the court's expressed statements that its impression of the case as a whole, including the tactics and effort of counsel, left it with the "feeling" that both sides should pay their own attorney fees, we hold that the court did not abuse its discretion in declining to award attorney fees to ORC.
 
 COSTS
 
 15
 Appellant bears costs.
 
 
 16
 MAYER, Circuit Judge, concurring in part and dissenting in part.
 
 
 17
 The district court's conclusion on inequitable conduct should also be affirmed. Its opinion admits of no doubt that it found Schering acted with intent to deceive the PTO.
 
 
 18
 The court expressly said the prior art GPCL brochure, which Schering had "knowingly withheld" from the PTO, taught every feature that, per Schering's representations to the Board of Appeals, distinguished its claims from the prior art. (For example, Schering said that " 'Weinberg fails to disclose or support contact lenses,' " to which the court responded: "But UVC [i.e. the withheld GPCL brochure] does!")
 
 
 19
 That the district court may not have fully articulated its finding does not warrant reversal. Cf. Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1540, 218 USPQ 871, 880 (Fed.Cir.1983). In my view, express findings that one knowingly withheld art of the highest materiality (according to the district court: "if such disclosure had been made, the '676 patent would not have issued...."), and made representations to the PTO that were false in light of the withheld art, and a conclusion that this was inequitable conduct, necessarily subsumes a finding of intent.
 
 
 20
 I am also puzzled by the statement that "the court nowhere purported because of 'inequitable conduct' to invalidate claims of the patent that were not even in dispute in this case, nor expressed any awareness that this would be the inevitable consequence of its conclusion of 'inequitable conduct.' " Ante. The effect of a finding of inequitable conduct is to render the patent, in its entirety, unenforceable. Kingsdown Medical Consultants, Ltd. v. Hollister Inc., No. 88-1265, slip op. at 20 (Fed.Cir. Dec. 21, 1988) (in banc). The district court was aware of this. On January 5, 1988, the court amended its judgment and unequivocally stated: "Patent No. 4,390,676 ... is adjudged to be ... unenforceable due to inequitable conduct in pursuing the application that resulted in the patent."
 
 
 21
 NICHOLS, Senior Circuit Judge, dissenting.
 
 
 22
 Respectfully, I dissent from the holding of invalidity under section 103. I assume, as we must, that you can always pick and choose from the prior art examples of the separate elements which the inventor combined to make his invention. This being so, whether it would have been obvious to combine them is what we must decide. Here one line of inventions comprised prior art plastic lenses to screen out ultraviolet light for aphakic eye patients, whether needing intraocular or contact devices. But these were unstable, subject to leaching, obviously a disaster for the patient if not promptly corrected. The other line, culminating in the Fertig patent '893, comprised a stable, nonleaching copolymerized plastic for bread wrappings, sheeting, roofing, and plastic boats, all nonmedical uses. Obviously you can define the "person ordinarily skilled in the art" so as to make it obvious to this paragon to take the plastic technology developed for such nonmedical uses, when the problem develops after prolonged exposure to sunlight, and apply it to the very different problem of the aphakic eye patient. The trial court achieved this by postulating a person with "the training and skills of a polymer chemist." Apparently the training and skill of this person includes awareness of the real needs of ocular medicine, though that branch of the healing arts had failed to make use of polymer chemistry hitherto. I would hold, however, that the trial court has simply invented a fictitious super scientist, unknown to the real world as it exists today, for the purpose of sustaining a result. I think a real polymer chemist would have been unaware of the needs of the aphakic patient, or even of his existence. A real doctor, expert in the medical needs of aphakic patients, would have been unaware how they stabilized the coloration of plastic boats, roofing, sheeting, and bread wrappers against the glare of the sun. Neither would have seen the possibility of transferring the technique to meet a wholly unlike need. To bring these different skills to play in unison required nonobvious invention.