51 CCPA

**Vernon C. APPLEGATE and John H. Howell, Appellants,**

v.

**Otto SCHERER, Heinz Frensch and Gerhard Stähler, Appellees.**

**Patent Appeal No. 7095.**

United States Court of Customs and Patent Appeals.

June 11, 1964.

Ernest S. Cohen, U. S. Dept. of Interior, Washington, D. C., for appellants.

Robert D. Spille, New York City (Henry W. Koster, Curtis, Morris & Safford, New York City, of counsel), for appellees.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Patent Interferences in favor of the junior party to interference No. 90,131, Scherer, Frensch and Stähler (herein "Scherer"), who are involved on their application serial No. 714,028, filed February 10, 1958.

The senior party-appellants, Applegate and Howell (herein "Applegate"), are involved on their application serial No. 652,316, filed April 11, 1957.

The invention is defined in the following single count:

"A method for controlling sea lampreys which comprises adding to a body of water inhabited by said lampreys 3–trifluoromethyl–4–nitrophenol."

The Scherer application is assigned to Farbwerke Huechst Aktiengesellschaft vormals Meister Lucius & Bruning, of the Federal Republic of Germany, whose New York representative was Progressive Color Company. The Applegate application is assigned to the Government of the United States, represented by the Department of the Interior.

By way of background, for several decades the sea lamprey had been causing havoc in the Great Lakes to commercial and game fish. The Fish and Wildlife Service of the Department of the Interior, under the direction of Applegate and Howell, was engaged in a large-scale screening program, seeking chemical compounds which would control the sea lamprey without undue harm to desirable fish species. The scheme was to treat streams where the lamprey spawn with a chemical which would destroy the larvae.

Prior to the invention here involved, as the result of examining thousands of compounds, 3–bromo–4–nitrophenol had been found to be efficacious. This fact was disclosed in the December 17, 1955, issue of Chemical Week. Thereafter Progressive Color Company wrote a letter to the Fish and Wildlife Service on December 29, 1955 (Mr. L. C. Balling to Mr. Applegate), saying:

"In various publications—specifically we refer to the December 17th issue of 'Chemical Week'—we have observed comments on the difficulty

encountered in finding a suitable chemical compound for the elimination of lampreys. We have also noted that your endeavors heretofore for an effective control of lampreys have focused on a chemical compound, viz. 3–bromo–4–nitrophenol, but because of the very high cost of this material your agency is still looking for an effective agent which perhaps could be procured at a reasonable cost.

"For your guidance we would like to mention that we are the representatives of Farbwerke Hoechst A. G., Frankfurt (Main) West Germany, one of the largest chemical manufacturers in that country and have communicated with them on this subject. The Pesticide Department of Farbwerke Hoechst has advised us that the production of 3–bromo–4–nitrophenol is rather difficult and for that reason are unable to offer it to us. However, they believe that a similar chemical compound namely 3–trifluormethyl–4–nitrophenol [sic] may even be more effective for the purpose you have in mind, and in the event you are interested in this matter we would be very glad to furnish you with free samples of this material. In the affirmative please be kind enough and let us hear from you indicating at the same time what quantities you wish to receive for conducting the necessary tests."

Applegate replied to this letter on January 19, 1956, as follows:

"I wish to thank you for your letter of December 29, 1955 in which you offer to provide us with a sample of 3–trifluormethyl–4–nitrophenol [sic] for testing as a candidate sea lamprey larvicide.

"Due to financial limitations and personnel shortages, we have not been accepting further substances for testing. These restrictions have forced us to limit our laboratory work exclusively to tests of the several substances which have shown some promise as specific sea lamprey larvicides. However, since we are interested in exploring the structures related to 3–bromo–4–nitrophenol, and since the substance you offer is similar to this compound, we feel that it would be advantageous to work it into our program.

"Only a small quantity of about three to four grams would be required for our preliminary screening tests. If you can arrange to have this amount of 3–trifluormethyl–4–nitrophenol [sic] shipped to us, we will be glad to explore its possibilities as a specific larvicide."

In February, 1956, the sample was delivered, it was tested, found to be effective, the patent applications followed, and the interference was declared.

Both parties are in agreement with the board's view that the sole issue is originality, or, who made the invention. Scherer contends that the subject matter of the count was fully disclosed to Applegate in the letter from Progressive Color Company of December 29, 1955, by reason of which fact Applegate did not make the invention. The board so held. In support of its decision, the board pointed out that Applegate (called as a witness by Scherer, the only party taking testimony) testified that before the date of the letter he did not know of the chemical of the count. The gist of the board's opinion is contained in the following paragraph:

"There is no doubt that the Scherer et al. letter of December 29, 1955 (Exh. 3) was a conception of the invention of the count. The letter names the chemical as a substitute for the bromo-compound, which had been added to water, for the elimination of sea lampreys (Applegate et al. Exh. 6). This is all that the count requires. It is sufficient if an inventor is able to make a disclosure which would enable a person of ordinary skill in the art to practice the disclosure without extensive research or experimentation; In re Tansel, 45 CCPA 834, 253 F.2d

241, 730 O.G. 283, 117 USPQ 188. We conclude, therefore, that the aforementioned letter amply meets the test of conception set forth in In re Tansel, supra, and so constitutes a full disclosure of the invention of the count in late December, 1955. This date is well prior to Applegate et al's. record date."

In view of the disclosure to him of a complete conception of the invention of the count, the board found, as a corollary, that the reduction to practice by Applegate, by the tests which demonstrated effectiveness for the intended purpose, inured to the benefit of Scherer, citing several precedents including this court's decision in Shumaker v. Paulson, 136 F.2d 700, 30 CCPA 1156.

Applegate's attack on the decision below is on the theory that Scherer did not conceive the invention; and to show that Scherer had no conception the further theory is propounded that under the law there could not be a conception until there was a reduction to practice, which reduction to practice was by Applegate who, therefore, was the first to conceive. Not having a conception of the invention, it is argued, Scherer could not communicate the invention to Applegate and therefore Applegate did not derive the invention from Scherer, as the board held he did. The case principally relied on to support this theory, which appears also to have been relied on heavily before the board, is Smith v. Bousquet, 111 F.2d 157, 27 CCPA 1136.

The board correctly pointed out that Smith v. Bousquet was not a case involving an issue of originality. Recently in Alpert v. Slatin, 305 F.2d 891, 49 CCPA 1343, we expressed agreement with views of the Board of Patent Interferences characterizing Smith v. Bousquet as an unusual type of case, the board saying, "In this type of research the inventor's mind cannot formulate a completed invention until he finally performs a successful experiment." We do not consider the instant situation to be of that type. In any event, the important distinction is that Smith and Bousquet were independent inventors pursuing their work separately, a situation which bears no parallel to the one here where one party communicated the totality of the invention defined in the count to the other, whether it be called a "conception" or by any other name.

It appears to us that appellants, as is too often the case, are relying on paragraphs lifted from a discussion of one situation to argue for a certain decision in an entirely different situation. An originality or derivation case, which this is, is quite unlike a case involving independent inventors, between whom true "priority" must be decided.[1]

Appellants seem to propose that there cannot *be* a conception of an invention of the type here involved in the absence of knowledge that the invention will *work*. Such knowledge, necessarily, can rest only on an actual reduction to practice. To adopt this proposition would mean, as a practical matter, that one could never communicate an invention thought up by him to another who is to try it out, for, when the tester succeeds, the one who does no more than exercise ordinary skill would be rewarded and the innovator would not be. Such can-

---

[1]. The board's opinion herein twice speaks of the issue as "priority" and, of course, expresses its decision as an award of "priority" to Scherer, which is a mere formality compelled by 35 U.S.C. § 135 which treats all interferences as involving an issue of priority. It is evident, however, that in an originality case the issue is not who is the *first* or *prior* inventor, but who *made* the invention. Applications "interfere" when one applicant gets the invention from the other, by fair means or foul, as well as when each makes the invention independently. In awarding "priority" to the *sole* inventor in an originality or derivation case, it should be realized that this is merely the employment of patent law jargon which is not to be taken literally. It might be well on the next revision of the statutes to use language suited to all situations so that the board does not have to make an award of "priority" where no issue of priority exists.

not be the law. A contrary intent is implicit in the statutes and in a multitude of precedents.

Thinking of the matter in this light and asking *who* made the invention, clearly it was Scherer who had the thought and not Applegate who merely made the test.

The decision of the board is affirmed. Affirmed.