John Alan MATTOR, Appellant,

v.

Petrus G. J. M. COOLEGEM, Appellee.

Patent Appeal No. 75–616.

United States Court of Customs and Patent Appeals.

March 18, 1976.

Rudolf E. Hutz, Wilmington, Del., atty. of record, for appellant.

Albert C. Johnston, New York City, atty. of record, for appellee.

Before Markey, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

BALDWIN, Judge.

This is an appeal from the decision of the Patent and Trademark Office Board of Patent Interferences awarding priority to senior party Coolegem. The board concluded that junior party Mattor had not established an actual reduction to practice earlier than February 7, 1969, the date afforded Coolegem based upon his foreign priority document.[1] We reverse.

*The Invention*

The invention herein is an electrophotographic element produced by coating a conductive support with a dispersion of an organic photoconductor (OPC) in an electrically insulating binder.[2] The sole count of the interference is as follows:

An electrophotographic element comprising a conductive support having coated thereon a photoconductive composition comprising an organic photoconductor and an electrically insulating binder, said photoconductor corresponding to the formula:

$$\begin{array}{ccc} R_1 & & R_3 \\ \diagdown & & \diagup \\ N-A_1-X-A_2-N & \\ \diagup & & \diagdown \\ R_2 & & R_4 \end{array}$$

wherein $A_1$ and $A_2$ are phenylene or substituted phenylene radicals, X represents oxo, thio, dithio or sulfonyl, and $R_1$, $R_2$, $R_3$ and $R_4$ represent alkyl or benzyl radicals.

*The Proceedings Below*

As stated previously, senior party Coolegem was afforded the benefit of the filing date of his British application, February 7, 1969, and took no testimony

---

1. Coolegem's application serial No. 9,061 was filed on February 5, 1970, claiming the benefit (35 U.S.C. § 119) of his British patent No. 6802/69 filed on February 7, 1969. Mattor filed application serial No. 844,186 on July 23, 1969.

2. *McGraw-Hill Dictionary of Scientific and Technical Terms* 1112 (1974) defines photoconductor as follows:

A nonmetallic solid whose conductivity increases when it is exposed to electromagnetic radiation.

Thus, a photoconductor is merely a substance which will hold an electrostatic charge in the dark, but when exposed to light, will conduct the charge away.

to prove earlier reduction to practice. Mattor did, however, take testimony in an attempt to prove an actual reduction to practice prior to February 7, 1969.

Mattor testified that he conceived the invention in the summer of 1966, at which time he tried to synthesize several organic compounds within the formula recited in the count which he felt would be photoconductive. After carrying out the synthesization steps, he was unable to perform the last step—the precipitation of a crystalline product—with some, but not all, of the compounds. None of the compounds was tested for photoconductivity at this time. Following this, his summer laboratory assistant left, and more pressing projects prevented further work until 1968 when he again was able to hire a summer laboratory assistant—Charlotte Loew.

Loew, Mattor and Larry Price, a co-worker of Mattor, testified that in August 1968, Loew synthesized two formulations—N,N,$N^1$,$N^1$—tetrabenzyl dithiodianiline and N,N,$N^1$,$N^1$—tetrabenzyl oxydianiline, while Price synthesized N,N,$N^1$,$N^1$—tetrabenzyl sulfonyldianiline. These compounds all fall within the generic class of photoconductors of the count.

Loew and Price performed three tests employing the above compounds. They began by dissolving a small amount of each crystalline compound in a polystyrene solution, then coated a piece of paper with each solution and allowed the composite elements to dry. The first test, called a K & E test, involved placing a coated piece of paper in a K & E machine. The coated paper was charged with a static charge on the order of 400–600 volts while a pen recorder recorded the surface voltage as a function of time, first with the paper in the dark and then, after a fixed period of time, with the paper exposed to light.

A Caps test was next performed wherein the coated paper elements were placed in a Caps-Jeffries enlarger. The elements were exposed through an image-bearing original and subsequently developed using a standard toner formulation.

The final test, called a Fadeometer test, merely involved exposure of the coated papers to high intensity radiation for about thirty minutes to provide artificial aging. The papers were then examined for possible fade and yellowing.

The test results appear in Loew's notebook. The K & E tests clearly indicate that the coated papers retained a static charge better in the dark than in the light, while the Fadeometer tests yielded samples which yellowed to varying degrees. Lastly, the Caps tests produced clear, legible images which were physically attached to appropriate pages in the Loew notebook. The notebook, however, contains no contemporaneous evaluation of these tests, nor did any witness corroborate Mattor's testimony that he recognized at that time that the formulations were in fact organic photoconductors.

Appellant's application, as originally filed, named both Mattor and Loew as co-inventors. Upon a motion pursuant to 37 CFR 1.45(b), Loew was removed as a co-inventor, and the application resultantly became that of Mattor as the sole inventor. Thus, the first issue that the board was called upon to decide was whether the record supports "the representations of fact made on Mattor's renewed motion to change the inventorship from Mattor and Loew to Mattor sole." With respect to this issue, the board concluded that Loew was not a joint inventor, stating:

*The genesis of the invention* including the proposed utility of the compounds as photoconductors began with Mattor. In our opinion Loew was another pair of hands of Mattor and her work inures to his benefit. Her success in obtaining crystals of the oxy and dithio compounds involved nothing more, it appears, than routine experimentation; certainly the record shows no more than this. The compounds embraced by the counts are old compounds and are made by following classical chemical reactions. This is not denied by Coolegem; in fact we do not find specific methods for making

the compounds of the count in the involved application of either party. Presumably, there was nothing esoteric or abstruse in the reaction mechanism and Loew used nothing more than routine experimentation to obtain the compounds.

The further issue which faced the board was whether "the record establish[ed] [an] actual reduction to practice on behalf of Mattor prior to February 7, 1969, the effective filing date of Coolegem." The board reached the ultimate conclusion that Mattor failed to establish an actual reduction to practice before the critical date:

> However, considering the remainder of the evidence as a whole, the record fails to establish an appreciation or conviction of success relative to the utility of invention of the count at the time the oxydianiline was tested, *Bren v. Henshaw*, 176 U.S.P.Q. 519 (CCPA 1973). Certainly, Loew, the summer employee did not appreciate the results of the tests nor did she have the qualifications to evaluate them. Price, who supervised Loew, made no evaluation of the results. The testimony of Mattor, the inventor, cannot be relied on since it is self-serving and cannot be given probative force even if it is uncontradicted and convincing unless it is supported by adequate corroboration. *Tidewater v. Gillette*, 124 U.S. P.Q. 245, 247, 248 (CA4 1959). In this case, adequate corroboration is lacking. The absence of contemporaneous reports to superiors or to patent counsel, contemporaneous comments attesting to some degree of success contributes to the total picture of a failure to establish actual reduction to practice.

## OPINION

Coolegem challenges that the N,N,N$^1$, N$^1$—tetrabenzyl sulfonyldianiline prepared by Price and compositions prepared by Loew (N,N,N$^1$,N$^1$—tetrabenzyl oxydianiline and dithiodianiline) had the predicted structures. All evidence, however, is to the contrary. Several chemists testified (1) that they would expect the reactions which were carried out to produce benzyl substitution of the terminal hydrogen atoms because of the weak hydrogen-nitrogen bond, (2) that infrared analysis shows the terminal nitrogens to be fully benzyl substituted, (3) that the resulting crystals had the proper melting points, and (4) that the substances were, in fact, photoconductive. We conclude from this that, in August 1968, Price and Loew did synthesize organic photoconductors falling within the count. See *Gianladis v. Kass*, 324 F.2d 322, 51 CCPA 753, 139 U.S.P.Q. 300 (1963).

We also conclude that the Caps test performed by Loew and Price evidences a reduction to practice. As stated previously, at Mattor's direction sheets of paper coated with formulations falling within the generic class of photoconductors of the count were charged, exposed and developed in a Caps-Jeffries enlarger. Excellent images were produced. Mattor testified below that from the results of these tests, which are present in Loew's notebook, the compounds prepared by Loew and Price were recognized by him as organic photoconductors.

Coolegem has asserted that the Loew notebook is not in evidence. Mattor's assignee asserted that the notebooks should not be cut up or pages removed and that those pages which pertained to other unrelated research should not be part of the record subject to examination by the technical personnel of competitor Coolegem. To allow the board and this court to see the original test results without damaging the evidence or making public other research, Mattor had copies of the pertinent pages marked in evidence and allowed the board and this court to retain the original notebook until final disposition of the case. We find this compromise solution reasonable. In light of these circumstances, we hold that the Loew notebook may be relied upon as evidence.

██ The evidence necessary for corroboration is determined by a rule of reason. *Anderson v. Pieper*, 442 F.2d 982, 58 CCPA 1221, 169 U.S.P.Q. 788

(1971). Corroboration is not a ritual but a method for determining the veracity of the testimony. An inventor's testimony is evidence, its weight a function of his credibility. One method of establishing credibility is by a corroborating witness, but it is not the only method.

■ Here there is physical evidence which reflects upon the veracity of Mattor's testimony that in 1968 he recognized that the compounds were OPC's. That physical evidence is the copies made by Loew and Price on the Caps-Jeffries enlarger. These copies are so good that we are convinced that Mattor or anyone skilled in the art would at once recognize that the compounds were OPC's. We conclude that these test results speak for themselves with sufficient clarity to verify Mattor's testimony.

■ Although, as Coolegem asserts, there is no indication that the OPC's made and tested were capable of being commercially exploited without further refinement, this is not necessary for a reduction to practice of the count. As we stated in *Koval v. Bodenschatz,* 463 F.2d 442, 447, 59 CCPA 1113, 1119, 174 U.S.P.Q. 451, 455 (1972):

> It is not necessary for testing to have proceeded to the point where the device is ready for commercialization in order to have an actual reduction to practice. * * * However, there must be a relationship between the test conditions and the intended functional setting * * * and the tests must prove that the invention will perform satisfactorily in the intended functional setting.

The tests carried out demonstrated that the compounds, when incorporated in an insulating binder and placed on a support, do, in fact, function as photoconductors and thus demonstrated a reduction to practice of the count. See *Land*

*v. Regan,* 342 F.2d 92, 52 CCPA 1048, 144 U.S.P.Q. 661 (1965).

■ Although the record indicates that Mattor's research was aimed at developing an organic photoconductor superior to the one currently being used, the count does not so require. The count only requires that the formulations, when placed upon a conductive support, produce an electrophotographic element. Therefore, Mattor's standards of success are irrelevant to the issue of reduction to practice. He needed only to recognize and appreciate that he had achieved the level of utility required by the count in order to have had a reduction to practice.

■ Lastly, we agree with the board that Loew was not a joint inventor. The evidence shows that Mattor conceived the invention before Loew began working for him and that in synthesizing the formulations and testing them with Price, Loew was following Mattor's oral instructions. We can find no contribution by Loew to the making of the invention; rather she is viewed as merely a technician for carrying out Mattor's instructions. We agree with the board that Mattor and Loew executed the joint application through inadvertence and mistake.

The decision of the board, awarding priority to Coolegem, is *reversed.*

*REVERSED.*