**Marlo BROWN, Plaintiff,**

v.

**REGENTS OF the UNIVERSITY OF CALIFORNIA, Defendant.**

**No. C 93–3499–FMS.**

United States District Court,
N.D. California.

May 16, 1994.

Richard R. Wiebe, Brobeck Phleger & Harrison, San Francisco, CA, Larry D. Johnson, San Rafael, CA, E.A. Figg, Bart G. Newland, Richard E. Campbell, Steven M. Lieberman, Rothwell Figg Ernst & Kurz P.C., Washington, DC, for plaintiff.

Jeffrey A. Miller, Lyon & Lyon, San Jose, CA, for defendant.

## AMENDED ORDER GRANTING SUMMARY JUDGMENT *

FERN M. SMITH, District Judge.

### ISSUE

Defendants have filed a motion for summary judgment as to plaintiff's sole remaining cause of action, for correction of inventorship under 35 U.S.C. § 256. *See* 35 U.S.C. § 256 (West 1984). The motion requires the Court to decide whether plaintiff has shown that she made sufficient contributions to the conception of United States Patents 5,037,753 ("the '753 patent") and 5,118,602 ("the '602 patent") to warrant a trial on the issue of whether plaintiff should be named as a joint inventor thereon. Because the Court finds that plaintiff has not satisfied her burden, it grants defendants' motion.

### BACKGROUND

Plaintiff is an animal health technician and former veterinary hospital manager who maintains a shelter for sick, stray and abandoned cats. In the early 1980's, plaintiff was sheltering between forty and fifty cats at her home in Petaluma, California. During that time, plaintiff observed that several of her cats were exhibiting immunodeficiency symptoms. She had her veterinarian, Dr. Titchenal, perform tests on the cats for a wide variety of diseases and conditions. All of the tests, including the test for feline leukemia virus ("FeLV"), were negative. At the time, FeLV was the only feline virus known to cause AIDS-like symptoms in cats.

At Dr. Titchenal's suggestion, on July 2, 1986, plaintiff took her sick cats to Dr. Neils C. Pedersen, a well-known animal virologist at the U.C. Davis School of Veterinary Medicine. Ms. Brown brought with her detailed observations and records that she had kept of her cats' illnesses.[1] She told Dr. Pedersen that she believed that her cats were infected with a virus similar to the human AIDS virus. She further claims that she told Dr. Pedersen that she believed that the virus was a new, "slow-acting" lentivirus. Dr. Pedersen examined the cats, questioned Ms. Brown about the cats' histories, and drew blood samples from the cats.

During 1986 and 1987, Dr. Pedersen and a colleague, Dr. Janet K. Yamamoto, performed extensive laboratory work which culminated in the development of methods for isolating a new virus, feline T-lymphotropic virus ("FTLV," "FIV"[2]), in a substantially pure, nonnaturally occurring, form. Drs. Pedersen and Yamamoto also developed methods for detecting the presence of FIV in cats, as well as methods for vaccinating them against the virus. On August 26, 1987, they

---

* Nonsubstantive changes made for publication with the consent of the parties.

1. The extent of Ms. Brown's observations and records is in dispute, but no resolution of that dispute is necessary to dispose of defendants' motion.

2. Over time, the scientific community began calling the virus "FIV," for feline immunodeficiency virus. The patents use the term "FTLV," but the Court adopts the more current terminology.

filed a patent application on these inventions. The '753 patent issued on August 6, 1991, and the '602 patent issued on June 2, 1992. The doctors assigned both patents to the University of California.[3]

The '753 patent claims FIV, a biologically active composition of matter ("biochemical compound") that has been isolated from cells grown in an *in vitro* culture. (*See* Amended Complaint, Ex. 1.) The '602 patent claims methods for diagnosing an FIV infection by detecting in a clinical sample the presence of the virus itself or antibodies to the virus. (*See* Amended Complaint, Ex. 2.) The claimed novelty of the '602 patent is based on the isolation and ·purification of the new biochemical product covered by the '753 patent. Neither patent claims mere discovery of FIV.

While Dr. Pedersen widely and publicly credited Ms. Brown for her role in the discovery of FIV, it is undisputed that Ms. Brown played no role in the laboratory work required to isolate and purify the virus, and to develop methods for diagnosing it. (*See, e.g.,* Reply 2–4.) Ms. Brown's central contention is essentially that she supplied the critical inventive contribution to the patents through her role in discovering the virus, and that the work of Drs. Pedersen and Yamamoto in isolating and purifying the virus was unoriginal.

## DISCUSSION

### I. The Summary Judgment Standard

In order to withstand a motion for summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue of material fact in dispute. Fed.R.Civ.P. 56(e) (West 1992). A dispute about a material fact is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In the absence of such facts, "the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### II. Section 256

Plaintiff's suit is for correction of inventorship under 35 U.S.C. § 256 (West 1984). Section 256 provides, in pertinent part:

Whenever ... through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Commissioner may, on application of all the parties and assignees ... issue a certificate correcting such error. ·

... The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Commissioner shall issue a certificate accordingly.

35 U.S.C. § 256. The Federal Circuit has held[4] that section 256 provides for district court jurisdiction over inventorship disputes.[5]

---

3. The University of California subsequently granted an exclusive license to the patents to IDEXX Laboratories, Inc. ("IDEXX"), for the development of diagnostic applications of U.C.'s FIV technology. U.C. and IDEXX brought suit against Synbiotics Corporation ("Synbiotics") for infringement of the '602 patent in the Southern District of California. One of Synbiotics's defenses was that it received a license to the patent from Ms. Brown, whom it claimed should be named as a joint inventor. On December 20, 1993, the court in the Southern District granted plaintiffs' motion for partial summary judgment, holding that Ms. Brown was not a joint inventor of either of the inventions claimed in the patents. As Ms. Brown is not a party to the Southern District action, she cannot be bound by that court's holding as to her claim of inventorship. Accordingly, this Court shall evaluate the issue anew.

4. The Federal Circuit has exclusive jurisdiction of appeals from the district court where the district court's jurisdiction was based, in whole or in part, on 28 U.S.C. § 1338, with certain exceptions relating to copyright and trademark cases. See 28 U.S.C. § 1295(a) (West 1993). The Federal Circuit held in *MCV, Inc. v. King–Seeley Thermos Co.,* 870 F.2d 1568, 1570 (Fed. Cir.1989), that a suit for correction of patent under section 256 is an action arising under the patent laws for purposes of 28 U.S.C. § 1338(a).

5. Plaintiff's burden in such cases is unclear: The burden of showing misjoinder or nonjoinder in actions seeking patent invalidation is that of clear and convincing evidence, *see Garrett Corp. v. U.S.,* 190 Ct.Cl. 858, 422 F.2d 874, 880 (1970), *cert. denied,* 400 U.S. 951, 91 S.Ct. 242, 27 L.Ed.2d 257 (1970); however, where all parties seek correction, the burden is that of preponder-

*See MCV, Inc. v. King–Seeley Thermos Co.,* 870 F.2d 1568 (Fed.Cir.1989).

## III. The Patents at Issue

The two patents at issue in this action are the '602 patent and the '753 patent. The parties agree that inventorship of the patents is the same. (*See* Opp. 14 n. 5.) The '753 patent claims FIV that has been isolated from cells grown in an *in vitro* cell culture. (Defendants' Memo 15; *see* Amended Complaint, Ex. 1.) The '602 patent claims methods for diagnosing an FIV infection by detecting in a clinical sample the presence of the virus or antibodies to the virus. (Defendants' Memo 16; Amended Complaint, Ex. 2.)

Neither patent claims mere discovery of the virus. Indeed, such a claim would be foreclosed by the Supreme Court's decision in *Diamond v. Chakrabarty,* 447 U.S. 303, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980). In *Chakrabarty* the Court held that, by contrast with "nonnaturally occurring ... composition[s] of matter" that are "product[s] of human ingenuity," "hitherto unknown natural phenomen[a]" are not patentable subject matter. 447 U.S. at 309. The Court reasoned that "[s]uch discoveries are 'manifestations of ... nature, free to all men and reserved exclusively to none.'" 447 U.S. at 309, 100 S.Ct. at 2207 (quoting *Funk Bros. Seed Co. v. Kalo Inoculant Co.,* 333 U.S. 127, 130, 68 S.Ct. 440, 441, 92 L.Ed. 588 (1948)).

## IV. The Requirement of Conception

■ The requirement of "conception" is basic to the concept of inventorship. To qualify as a joint inventor, a claimant must have contributed to the conception of the invention. *In re Hardee,* 223 U.S.P.Q. 1122 (Comm'r Pat. & Trademarks 1984). The parties in the present action dispute both what conception means in the context of joint inventorship and to what extent plaintiff must have contributed to the conception of the inventions to qualify as a joint inventor.

ance of the evidence, 1 D. Chisum, Patents § 2.04[7] (1990).

**6.** This lack of clarity is undoubtedly attributable to the fact that "the patent law does not regard

## A. Conception in the Joint Inventorship Context

Although, as a general matter, "the exact parameters of what constitutes joint inventorship ... is one of the muddiest concepts in the muddy metaphysics of the patent law," [6] *Mueller Brass Co. v. Reading Industries, Inc.,* 352 F.Supp. 1357, 1372 (E.D.Pa. 1972), aff'd, 487 F.2d 1395 (3d Cir.1973), certain guidelines are available. Plaintiff must, at a minimum, have contributed to the conception of the invention. *See In re Hardee,* 223 U.S.P.Q. at 1123. The Federal Circuit has adopted the following definition of "conception" from the Court of Customs and Patent Appeals: "[Conception is] the formation, in the mind of the inventor of *a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice ....*" *Coleman v. Dines,* 754 F.2d 353, 359 (Fed.Cir.1985). In a passage that has been widely cited, one district court held that an individual must have played an "inventive" role in making an "original contribution" to the "final solution" of a problem to qualify as a joint inventor. *Monsanto Co. v. Kamp,* 269 F.Supp. 818, 824 (D.D.C.1967).

## B. The Doctrine of Simultaneous Conception and Reduction to Practice

■ Defendants argue that, as biochemical substances, the inventions that are the subjects of patents '602 and '753 could not have been conceived until they were reduced to practice in the laboratory. (*See* Memo 13–20; Reply 12–20.) As plaintiff undisputedly did not participate in any of the laboratory work necessary to reduce the claimed inventions to practice by isolating, purifying and characterizing FIV, defendants submit that she could not have contributed to the conception of the inventions.

Under the doctrine of simultaneous conception and reduction to practice, the Federal Circuit has held that complex chemical

as crucial the question whether an invention is the product of several joint inventors, or of a sole inventor." *Monsanto Co. v. Kamp,* 269 F.Supp. 818, 824 (D.D.C.1967).

compounds are not conceived until they have been reduced to practice. *See, e.g., Amgen, Inc. v. Chugai Pharmaceutical Co.*, 927 F.2d 1200 (Fed.Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991). The rationale behind the doctrine is that "[c]onception requires both the idea of the invention's structure and possession of an operative method of making it" and that, in the case of chemical compounds, an inventor cannot acquire the latter until she has reduced the idea to practice through a successful experiment. *See Amgen,* 927 F.2d at 1206.

*Amgen* involved a patent that claimed a method for purification of erythropoietin ("EPO"), a gene, and erythropoietin compositions. Defendants argued that plaintiff's patent was rendered invalid by the work of one of their scientists, who had identified and isolated the EPO gene after plaintiff's employee but who, they contended, conceived of a strategy for isolating the gene first. The court rejected defendants' argument, holding that the isolated and purified gene could not have been conceived until it was reduced to practice. The court explained:

> Conception does not occur unless one has a mental picture of the structure of the chemical, or is able to define it by its method of preparation, its physical or chemical properties, or whatever characteristics sufficiently distinguish it. It is not sufficient to define it solely by its principal biological property ... because an alleged conception having no more specificity than that is simply a wish to know the identity of any material with that biological property. We hold that when an inventor is unable to envision the detailed constitution of a gene so as to distinguish it from other materials, as well as a method for obtaining it, conception has not been achieved until reduction to practice has occurred, i.e., until after the gene has been isolated.

927 F.2d at 1206. As plaintiff's employee had succeeded in isolating the EPO gene first, the work of defendants' scientist was not prior art that tended to invalidate plaintiff's patent.

Plaintiff contends that the doctrine of simultaneous conception and reduction to practice is inapplicable where the issue is originality, not priority. (*See* Opp. 8–13.) Plaintiff effectively maintains that the definition of "conception" varies depending upon the procedural juncture at which the issue is considered.

Plaintiff relies on *Applegate v. Scherer,* 332 F.2d 571 (C.C.P.A.1964) and *MacMillan v. Moffett,* 432 F.2d 1237 (C.C.P.A.1970), to support her argument that the doctrine is inapplicable to this case. *Applegate* involved an interference proceeding on a patent that claimed a method for controlling the reproduction of sea lampreys by using a known chemical compound in a new manner. The court upheld the board's determination that defendant was the inventor of the method, reasoning that reduction to practice was not required for conception of the invention and that defendant had fully disclosed the invention in a letter to plaintiff. *MacMillan* also involved an interference proceeding. In that case, defendant had selected sixty-nine known chemical compounds to be tested by plaintiff, a Procter and Gamble scientist, for potential new use as a topical antiperspirants. The court held that defendant was the inventor of the antiperspirant, as defendant's conception of the invention was complete when he selected and designated the compounds for testing. As in *Applegate,* the court held that conception was complete before the invention had been reduced to practice through a successful experiment.

In addressing the doctrine of simultaneous conception and reduction to practice, the court stated in *Applegate:*

> Recently ... we expressed agreement with views of the Board of Patent Interferences characterizing Smith v. Bousquet as an unusual type of case, the board saying, 'In this type of research the inventor's mind cannot formulate a completed invention until he finally performs a successful experiment.' We do not consider the instant situation to be of that type.

332 F.2d at 573. Although the court's treatment of the issue was cursory, its rationale seemed to be that, as a factual matter, the conception of a method for controlling sea

lamprey reproduction through the new use of a known chemical was one that was possible before the invention had actually been reduced to practice. The court used language, however, that could be viewed as casting the distinction as one between derivation and priority:

> [T]he important distinction [between this case and Smith v. Bousquet] is that Smith and Bousquet were independent inventors pursuing their work separately, a situation which bears no parallel to the one here where one party communicated the totality of the invention defined in the count to the other, whether it be called a "conception" or by any other name.

332 F.2d at 573.

In *MacMillan* the court seized upon the latter language in *Applegate* to declare by fiat that the doctrine of simultaneous conception and reduction to practice is inapplicable outside the context of priority contests. The court in *MacMillan* could easily have based its decision on the ground that, as a factual matter, the invention at issue was capable of being conceived prior to its reduction to practice. As in *Applegate*, the invention consisted of a new use of a known compound. Instead of embracing that rationale, however, the court made the following statements about the doctrine of simultaneous conception and reduction to practice:

> According to that 'doctrine,' in some unpredictable areas of chemistry and biology, there is no conception until the invention has been reduced to practice. The 'reason' given by Robinson for this is that until reduction to practice occurs in such cases the inventor does not *know* that the invention will work. It is [plaintiff's] position that this court, in Smith v. Bousquet, applied such a doctrine of simultaneous conception and reduction to practice. Whether or not the holding in Smith v. Bousquet

was based on such a doctrine, this court's decision in Applegate v. Scherer made it abundantly clear that such a doctrine does not apply in cases where the issue is originality or derivation. This is such a case.

432 F.2d at 1240. *MacMillan*, thus, compounded what seems to have been an inadvertent error in *Applegate*. As the question of joint inventorship was not at stake in *MacMillan*, however, its broad pronouncements on the applicability of the doctrine of simultaneous conception and reduction to practice were largely dicta.

Subsequent statements by the Federal Circuit[7] cast doubt on *MacMillan's* expansive statements about the doctrine. In *Fiers v. Revel*, 984 F.2d 1164, 1169 (Fed.Cir.1993), a case that involved a priority contest, the court observed:

> The difficulty that would arise if we were to hold that a conception occurs when one has only the idea of a compound, defining it by its hoped-for function, is that would-be inventors would file patent applications before they had made their inventions and before they could describe them. That is not consistent with the statute or the policy behind the statute, which is to promote disclosure of inventions, not of research plans.

The important policy consideration noted in *Fiers* is equally applicable where the issue before the court is originality, and it highlights the untenability of employing different definitions of "conception" depending upon the context in which the Court considers the issue. Accordingly, the Court is of the opinion that the Federal Circuit would apply the doctrine of simultaneous conception and reduction to practice to cases, such as the instant case, where the issue of originality arises in the context of a joint inventorship dispute.[8]

---

7. As successor to the Court of Customs and Patent Appeals, the Federal Circuit has adopted the holdings of that court and of the Court of Claims insofar as they pertain to matters within the substantive jurisdiction of the Federal Circuit. *See South Corp. v. U.S.*, 690 F.2d 1368, 1370 (Fed.Cir.1982).

8. *Sewall v. Walters*, 21 F.3d 411 (Fed.Cir.1994), to which plaintiff cites the Court in a surreply

letter brief, is not to the contrary. That case merely cites a footnote in *Applegate* that discusses the distinction between the terminology of "priority" and "originality." *See* 21 F.3d at 415 (citing *Applegate*, 332 F.2d at 573 n. 1). *Sewall* does not address the doctrine of simultaneous conception and reduction to practice, and, indeed, that issue was not raised by the facts of that case.

### C. Plaintiff's Contributions to the '602 and '753 Patents

Applying the principles set forth above, it is evident that Ms. Brown did not contribute to the conception of the inventions covered by the patents at issue in this case. Viewing plaintiff's contentions in the most favorable light, and ignoring disputes as to the extent of plaintiff's contributions (*see* Reply 3–4, 18–19), she at most played a substantial role in the discovery of FIV. The patents in this case do not claim discovery of the virus, however; they claim isolation and substantial purification of the virus, as well as methods for diagnosing the virus by detecting the presence of the virus itself, or antibodies to it, in a clinical sample. (*See* Defendants' Memo 15–16; Amended Complaint, Exs. 1, 2.)

As the patents cover biochemical substances, under *Amgen* and *Fiers,* they cannot have been conceived prior to their reduction to practice in the laboratory of Drs. Pedersen and Yamamoto. Ms. Brown is a nonscientist who played no role in the laboratory work involved in isolating the virus; therefore, regardless of the value of her research leads, she cannot be deemed to have contributed to the conception of the inventions covered by the patents. Her arguments as to the uninventiveness of Drs. Pedersen's and Yamamoto's contributions go to the validity of the patents in the first instance,[9] not to her right to be named as a joint inventor thereon.

### CONCLUSION

For the reasons set forth above, the Court holds that Ms. Brown was not a joint inventor of the inventions claimed by the '602 and '753 patents. The Court accordingly GRANTS defendants' motion for summary judgment and DENIES plaintiff's motion for reconsideration.

SO ORDERED.

9. The issue of validity is not before the Court.